IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JANET BERRY,

        Plaintiff,                          No. CIV S-09-1741 GGH

   vs.

MICHAEL J. ASTRUE,             <u>ORDER</u>
Commissioner of
Social Security,

        Defendant.
_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"). For the reasons that follow, Plaintiff's Motion for Remand is granted in part, the Commissioner's Cross Motion for Summary Judgment is denied, and this matter is remanded to the ALJ for further findings as directed in this opinion. The Clerk is directed to enter judgment for plaintiff.

<u>BACKGROUND</u>

        Plaintiff, born April 25, 1952, applied on March 19 and April 9, 2004 for disability benefits. (Tr. at 99, 65.) Plaintiff alleged she was unable to work due to poor vision,

1

1  asthma, arthritis, knee problems, and tremors. (Tr. at 93, 112, 137.)  In a decision dated May 11,

2  2005, ALJ Mark C. Ramsey determined that plaintiff was not disabled. (Id. at 65-73.)  Upon

3  review, the Appeals Council remanded the case and two hearings were held on November 21,

4  2006 and January 11, 2007. (Id. at 97-98, 392-436, 437-469.)  The ALJ issued another decision

5  on March 1, 2007, determining that plaintiff was not disabled, and the Appeals Council denied

6  review. (Id. at 29-40.)  The March, 2007 decision of the ALJ therefore constitutes the final

7  decision of the Commissioner.  In this decision, ALJ Ramsey made the following findings:[1]

      1.    The claimant met the insured status requirements of the Social Security Act through December 31, 2006.

      2.    The claimant has not engaged in substantial gainful activity since October 30, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

    Step one: Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
    Step two: Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
    Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
    Step four: Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
    Step five: Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

    The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

3. The claimant has the following severe combination of impairments: osteoarthritis of the knees, retinitis pigmentosa with peripheral and manacular involvement and myopic astigmatism (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently, walk/stand six hours, sit six hours, occasionally perform postural activities (these are supported by her right knee osteoarthritis, giving her some benefit of doubt, and given her daily activities as identified below), avoid jobs requiring good visual acuity, and avoid driving, working at heights and around moving machinery (these are supported by her retinitis pigmentosa with peripheral and manacular involvement and myopic astigmatism coupled with her partially credible vision complaints), and she has no manipulative, communicative, mental, or other visual or environmental limitations.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 25, 1952 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

3

> 11. The claimant has not been under a disability, as defined in the Social Security Act, from October 30, 2002 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. at 29-40.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Erred in Failing to Include Plaintiff's Obesity as a Severe Impairment at Step Two; B. Whether the Commissioner Failed to Develop the Record by 1. Rejecting the Additional Evidence from Plaintiff's Treating Retinal Specialist Without Articulating a Legitimate Basis; 2. Failing to Remand Plaintiff's Case so that the Psychogenic Basis of Her Tremors Could be Assessed; 3. Failing to Develop the Record in Regard to Plaintiff's Physical Residual Functional Capacity; and C. Whether the ALJ Failed to Reference Third Party Testimony.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), *quoting* Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

\\\\\

\\\\\

4

ANALYSIS

    A.  Whether Plaintiff's Obesity Constitutes a Severe Impairment at Step Two

Plaintiff first contends that in considering her impairments at step two, the ALJ failed to consider plaintiff's obesity as a severe impairment. If this condition is not a severe impairment, there is no need to proceed with further consideration of its impact on plaintiff's functional capacity.

An impairment is not severe only if it "would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered." SSR 85-28. The purpose of step two is to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were taken into account. Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct. 2287 (1987). "The step-two inquiry is a de minimis screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).

Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005), considered plaintiff's obesity at all stages of the sequential analysis in light of Celaya v. Halter, 332 F.3d 1177 (9th Cir. 2003). The Celaya factors include whether, despite plaintiff's failure to specifically raise obesity, it was raised as a disabling factor in plaintiff's report of symptoms, whether it was clear from the record that the obesity was close to the listing criterion, and could exacerbate the other alleged impairments, and whether the ALJ should have been on notice of the need to develop the record on obesity due to plaintiff's pro se status, in light of his observation of plaintiff and other information in the record. Id. at 1182.

The ALJ found only plaintiff's osteoarthritis of the knees, retinitis pigmentosa with peripheral and manacular involvement, and myopic astigmatism to be severe impairments. In regard to obesity, the ALJ's only mention of it in his opinion was in summarizing Dr. Schaefer's records in which he advised her to lose weight and exercise. (Tr. at 36.) The ALJ did not otherwise address plaintiff's obesity. The undersigned has reviewed the record for any

indication of obesity and found several significant references. At 5 feet 4 ½ inches tall, plaintiff's weight fluctuated between 222 and 241 pounds. On March 22, 2006, obesity was listed as one of the diagnoses. It was noted that plaintiff's venous pressure could not be seen due to her obesity. Plaintiff was advised to lose weight and continue with her exercise program. (Tr. at 291.) Elsewhere, there are a few notes by practitioners when conducting a physical exam which described plaintiff's general presentation or advised her to lose weight. (Id. at 168, 341, 283, 212.)

Importantly, on two occasions plaintiff's weight was linked to her knee problems. On February 18, 2000, Dr. Carr noted: "overweight and antalgic gait."[2] (Id. at 171.) On April 4, 2005, during an exam it was noted that pelvic area was "normal, limited by weight." Range of motion was limited due to obesity. Plaintiff was diagnosed with asthma at this time and the plan was to rule out osteoarthritis in the knees. (Id. at 341.) As defendant acknowledges, "[o]besity may still enter into a multiple impairment analysis, but only by dint of its impact upon the claimant's musculoskeletal, respiratory, or cardiovascular system." Celaya v. Halter, 332 F.3d 1177, 1181 n. 1 (9th Cir. 2003). In this case, one progress report noted both plaintiff's asthma and musculoskeletal problems in relation to her obesity. Another chart note diagnosed hyperlipidemia and hypertension. (Tr. at 337.)

According to Social Security Ruling 02-01p, plaintiff's body mass index (BMI) of between 38 and 41 at weights between 222 and 241 categorize her at obese to extremely obese.[3] See www.nhlbisupport.com/bmi. Although plaintiff's initial filings with the Social Security Administration did not raise obesity as an impairment, but only her knee and vision problems, asthma, arthritis, and nerve attacks, her counsel raised obesity as an issue. Between the time of

---

[2] Antalgic gait is described as a limp to avoid pain on weight bearing structures, and characterized by a very short stance phase. http://medical-dictionary.the freedictionary.com.

[3] "BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m2). For adults, both men and women, the Clinical Guidelines describe a BMI of 30.0 to 39.0 as 'obesity, and 40 and above as 'extreme obesity.'" SSR 02-01p.

1  the first hearing after remand to the second hearing after remand, counsel sent a letter to the ALJ,
2  pointing out additional medical reports which indicated that plaintiff was assessed with chest
3  pain, hypertension, SVT (supraventricular tachycardia) and cardiac risk factor based on her
4  obesity and hypertension.  It was also noted that she had a history of cardiac disease in her
5  family.  Plaintiff was not able to complete a treadmill test due to her impairments.  Plaintiff's
6  counsel pointed out other medical records indicating obesity.  (Tr. at 165.)  Despite this letter,
7  plaintiff's counsel at hearing failed to question her about her weight.  (Tr. at 437-69.)[4]  Plaintiff's
8  counsel also did not raise obesity as a factor at the Appeals Counsel level.

In this case, although there are only a few reports discussing plaintiff's weight with very little recommendation, and no record of a BMI, there was sufficient evidence and argument to put the ALJ on notice to consider it as a limiting factor, especially in light of the fact that plaintiff's knee problems, asthma, hyperlipidemia and hypertension were surely affected by her obesity.  A consideration of the impact of plaintiff's obesity on her knee restrictions may make a difference to her limitations.  As explained by Social Security Ruling 02-01p:

> When the evidence in a case does not include a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or BMI, we may ask a medical source to clarify whether the individual has obesity. However, in most such cases we will use our judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating or examining source has not indicated a diagnosis of obesity.

Furthermore, although SSR 02-01p makes clear that obesity is a disease that must be considered when evaluating disability, and the "combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately," the ALJ "will evaluate each case based on the information in the case record."  (Id.)

Here, the record was clear and the ALJ should have found obesity to be a severe

---

[4] The second post-remand hearing was conducted solely to question the vocational expert.  (Tr. at 392-436.)

7

impairment, as well as substantively addressed the combined effects of obesity with other impairments. Even if it is ultimately determined that listing equivalence is not satisfied, the ALJ must take into account the fact of obesity at the other levels of the sequential analysis. This case cannot be "finally" adjudicated because this issue was not fully addressed. As required by Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993), the ALJ must consider obesity which exacerbates an impairment as an additive, impairing factor unless the ALJ makes a specific factual finding based on substantial evidence that the obesity is remediable. No such finding was or could be made on the present record. Accordingly, the matter will be remanded for further consideration by the ALJ and further development of the record if necessary.

B. Whether the Commissioner Failed to Develop the Record

Plaintiff next complains of errors in failing to develop the record by the ALJ, and in failing to remand for further development by the Appeals Council.

Disability hearings are not adversarial. Dixon v. Heckler, 811 F.2d 506, 510 (10th Cir. 1987) (holding that ALJ has basic duty to "inform himself about facts relevant to his decision") (quoting Heckler v. Campbell, 461 U.S. 458, 471 n.1 (1983) (Brennan, J., concurring)). The ALJ must fully and fairly develop the record, and when a claimant is not represented by counsel, an ALJ must be "especially diligent in exploring for all relevant facts." Tonapetyan v. Halter, 242 F.3d 1144 (9th Cir. 2001).[5] The duty also is heightened in the case of a mentally ill claimant who may not be able to protect him or herself. Id.

Evidence raising an issue requiring the ALJ to investigate further depends on the case. Generally, there must be some objective evidence suggesting a condition which could have a material impact on the disability decision. See Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir.1996); Wainwright v. Secretary of Health and Human Services, 939 F.2d 680, 682 (9th Cir.1991). "Ambiguous evidence . . . triggers the ALJ's duty to 'conduct an appropriate

---

[5] See also Crane v. Shalala, 76 F.3d 251, 255 (9th Cir.1996) (ALJ has duty to develop the record even when claimant is represented).

1 inquiry.'"  Tonapetyan, 242 F.3d at 1150 (quoting Smolen, 80 F.3d at 1288.)

2       The ALJ can develop the record by (1) making a reasonable attempt to obtain medical evidence from the claimant's treating sources, (2) ordering a consultative examination when the medical evidence is incomplete or unclear and undermines ability to resolve the disability issue; (3) subpoenaing or submitting questions to the claimant's physicians; (4) continuing the hearing; or (5) keeping the record open for supplementation.  See Tonapetyan, 242 F.3d. at 1150; 20 C.F.R. 404.1517, 416.917; 42 U.S.C. § 423(d)(5)(A), (B).  Ordering a consultative examination ordinarily is discretionary, see Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir.1991); Jones v. Bowen, 829 F.2d 524, 526 (5th Cir.1987), and is required only when necessary to resolve the disability issue.  See Reeves v. Heckler, 734 F.2d 519, 522 (11th Cir.1984); Turner v. Califano, 563 F.2d 669, 671 (5th Cir.1977).

      If the Appeals Council accepts review and renders a decision, the final decision of the Secretary is that of the Appeals Council.  20 C.F.R. § 404.981; Reyes v. Bowen, 845 F.2d 242, 244 (10th Cir. 1988).

### 1. Whether the Appeals Council Rejected Additional Evidence from Plaintiff's Treating Retinal Specialist Without Articulating a Legitimate Basis

      Plaintiff asserts that evidence submitted to the Appeals Council in the form of reports dated May 16, 2007 and August 27, 2008, by plaintiff's treating retinal specialist, Dr. Equi, were improperly rejected.[6]  The first report, issued two and a half months after the ALJ's second decision, found that plaintiff's vision had worsened to 20/80 in the right eye and 20/200

\\\\\

\\\\\

---

[6] Evidence presented to the Appeals Council is part of the record for district court review.  Ramirez v. Shalala, 8 F.3d 1449, 1452 (9th Cir.1993); accord, O'Dell v. Shalala, 44 F.3d at 859 (10th Cir.1994), Keeton v. Dept. of Health & Human Services, 21 F.3d 1064, 1067 (11th Cir.1994), Riley v. Shalala, 18 F.3d 619, 622 (8th Cir.1994), Wilkins v. Dept. of Health and Human Services, 953 F.2d 93, 96 (4th Cir.1991).

in the left eye. (Tr. at 378.) This measurement is defined as low vision.[7] Dr. Equi's August 27, 2008 report found that plaintiff was legally blind and that it was irreversible and permanent. (Id. at 389.)

The Appeals Council's decision stated in regard to these reports: "In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the Administrative law Judge's decision." (Id. at 8-9.) Plaintiff objects that the Appeals Council provided no reason for this rejection but issued only this boilerplate decision. It is true that the most recent report may be the most probative, and it does demonstrate the rapid deterioration in plaintiff's vision; however, the August, 2008 report was issued one and a half years after the ALJ's second decision and is therefore not relevant to the period at issue. "The Appeals Council shall consider any new and material evidence only where it relates to the period on or before the date of the ALJ's decision." Bates v. Sullivan, 894 F.2d 1059, 1064 (9th Cir. 1990), overruled in part on other grounds, Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991); 20 C.F.R. § 404.970(b). This report would be pertinent to a new application for benefits, but not to the present application.[8]

The March, 2007 report is much more contemporaneous to the ALJ's May, 2007 decision; however, it does not change the decision. It diagnosed low vision for the pertinent time period which is the same level of vision previously acknowledged by the ALJ. Its report of 20/80 in the right eye and 20/200 in the left eye is almost the same visual acuity reading reported by Dr. Yamada in September, 2006: 20/70+ and 20/200+. (Tr. at 266.) The ALJ relied on these

---

[7] Low vision is vision of less than 20/60 but equal to or better than 20/200. Legal blindness is defined as vision of 20/200 or less in the better eye with full correction. Http://en.wikipedia.org.

[8] Clearly, the August, 2008 report is competent evidence of disability as of *that* date. Nevertheless, under Bates, it does not prove disability for the time period *prior* to the ALJ's decision, which is the pertinent time period in this case.

measurements in his determination. (Id. at 35, 38, 39.) Therefore, there was no error by the Appeals Council in finding that this report by Dr. Equi provided no basis for changing the ALJ's decision as it was not material.

        2. <u>Whether the Commissioner Erred in Failing to Remand Plaintiff's Case so that the Psychogenic Basis of Her Tremors Could be Assessed</u>

Plaintiff next contends that her uncontrollable shaking requires further work-up based on her treating neurologist's impression that she had "psychogenic generalized tremor attacks," and needed referral to a psychiatrist. (Tr. at 386.) She claims it was error for the Appeals Council to fail to discuss this evidence and summarily deciding that it was not significant.

In this case, the ALJ did consider plaintiff's uncontrollable shaking episodes. He noted that there was no evidence of treatment for this problem such as diagnostic studies or medication. (Id. at 36.) In fact, Dr. Schaefer had indicated that her shakes did not appear to be related to any seizure activity. (Id. at 37, 295.) The ALJ also noted that plaintiff had been suffering from these uncontrollable shakes for the past year with no thorough work up to determine their etiology, according to Dr. Kindt. (Id. at 35, 243.) Treating notes do mention an EEG in 2005 which was normal. (Id. at 281.) Although plaintiff experienced them every day, they lasted for a brief period only and she experienced no loss of consciousness. (Id.) In any event, the ALJ did consider her episodes of tremors in limiting her to work which did not involve working at heights or around dangerous machinery. (Tr. at 402-03.) The only limitation placed on her by treating sources was to avoid driving. (Tr. at 35). She no longer had a driver's license due to her low vision.

Plaintiff requests a remand for assessment of a psychological basis for plaintiff's tremors. The pinpointing of a cause would not change the ALJ's already assessed limitations. The fact remains that plaintiff's shakes are not an indication of a physical ailment which includes other potentially limiting features. The full extent of her physical limitations is already known

and was accounted for in the hypothetical to the vocational expert. Knowing plaintiff's diagnosis upon remand would not change the types of jobs plaintiff can do. Furthermore, any medication which might control these tremors would not make any difference to plaintiff's residual functional capacity because she still would have to be restricted from working at heights and around moving machinery in any event based on her low vision. Because she does not lose consciousness as a result of the tremors and this limitation was already properly figured into the hypothetical to the expert, remanding to determine a psychological basis would not change the result. The Appeals Council was not required to remand the matter to the ALJ for further development on this basis.

        3. <u>Whether the ALJ Failed to Develop the Record with Regard to Plaintiff's Physical Residual Functional Capacity</u>

Plaintiff contends that the ALJ failed to develop the record in regard to plaintiff's RFC, by not ordering a consultative exam and residual functional capacity assessment. This issue may need to be re-analyzed by the ALJ at a later time after the previously discussed issues are considered on remand. The undersigned will analyze RFC based on the current record.

Social Security Ruling 96-8p sets forth the policy interpretation of the Commissioner for assessing residual functional capacity. SSR 96-8p. Residual functional capacity is what a person "can still do despite [the individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a); <u>see</u> <u>also</u> <u>Valencia v. Heckler</u>, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").

The ALJ found in this regard that plaintiff could "lift 20 pounds occasionally and 10 pounds frequently, walk/stand six hours, sit six hours, occasionally perform postural activities, ... avoid jobs requiring good visual acuity, and avoid driving, working at heights and around moving machinery,... and she has no manipulative, communicative, mental, or other visual or environmental limitations." (Tr. at 32.)

Plaintiff takes issue with the ALJ's alleged failure to include her obesity, arthritis

and asthma in the RFC and failure to obtain a consultative exam to determine the combined impact of these problems in combination with her vision problems. The obesity issue will be considered on remand in accordance with the first issue discussed *supra*.

In regard to plaintiff's asthma, the records do not indicate whether this impairment may or may not be controlled by medication. A condition which can be controlled or corrected by medication is not disabling. See Montijo v. Secretary of HHS, 729 F.2d 599, 600 (9th Cir.1984) (Addison's Disease controlled with medications deemed not disabling); Odle v. Heckler, 707 F.2d 439, 440 (9th Cir.1983) (rib condition controlled with antibiotics not considered disabling). Dr. Kindt noted that plaintiff was required to use her rescue inhaler on a daily basis. (Tr. at 243.) At an August 4, 2000 visit to UCD Medical Group, plaintiff was directed to continue her Ventolin after she was found to be wheezing. (Id. at 168.) Plaintiff was also diagnosed with asthma on April 4, 2005, and was prescribed albuterol. (Id. at 341.) Plaintiff testified that exertion does not trigger her asthma, but that smoking and aerosols may provoke attacks. (Id. at 494.) The medical records are not clear in indicating whether or not plaintiff's asthma could be controlled. (Id.) The ALJ correctly noted that plaintiff's asthma did not result in any emergency room visits or pulmonary function tests. (Id. at 36.) Nevertheless, plaintiff testified that she had to take her rescue inhaler three to four times a day depending on the severity of her asthma. (Id. at 455, 494.) Because this case must be remanded to determine the effect of plaintiff's obesity on her other impairments and at all steps of the analysis, it should also be considered in combination with her asthma. There is mounting evidence that obesity is a risk factor for asthma. Www.ncbi.nlm.nih.gov; www.medicalnewstoday.com; www.sciencedaily.com.

Plaintiff's arthritis in her knees also requires further consideration. It is true that the ALJ noted no evidence of surgery, pain injections, or treatment by specialists, physical therapists, chiropractors, or a pain clinic, and that plaintiff took only over the counter medications for pain and her daily activities were consistent with light work. (Tr. at 36-37.)

1  Plaintiff does not contest these findings made in conjunction with the ALJ's credibility analysis.

2  Nevertheless, as recited in the section on obesity at step two, *supra*, plaintiff's knee problems

3  may be exacerbated by her obesity. Dr. Carr noted her antalgic gait and that she was overweight.

4  (Id. at 171.) Dr. Desouza's chart note indicated that plaintiff's range of motion was limited due

5  to her obesity. He planned to rule out osteoarthritis in the knees. (Id. at 341.) Another note by

6  her treating physician referred to her musculoskeletal problems in relation to her obesity, and

7  noted chronic right knee pain. (Tr. at 337.) On April 5, 2005, knee x-rays indicated narrowing

8  of the medial knee joint space, with the impression of modest arthritis, slightly more on the right

9  knee. (Id. at 347.) On June 27, 2005, plaintiff was diagnosed with degenerative joint disease in

10 both knees. (Id. at 326.) It is established that obese women have almost four times the risk of

11 osteoarthritis in the knees compared to women who are not obese. Www.hopkins-arthritis.org.

12         It also is apparent from the record that plaintiff's knee problems may have

13 worsened over time. Plaintiff reported to Dr. Kindt on February 7, 2005, that her knee pain was

14 getting worse, causing more difficulty in walking.[9] (Id. at 243.) Plaintiff testified that she used

15 to ride a bike every two to three weeks, but has not been riding regularly due to the pain in her

16 leg. (Id. at 401.) Plaintiff also testified that if she stoops, she can not stay in that position for

17 longer than fifteen minutes or she will not be able to get up. (Id. at 459.)

18         Plaintiff additionally points out that the RFC assessment by the State Agency was

19 completed prior to her knee x-rays and makes no mention of this problem, but referred only to

20 her obesity and vision impairments. (Tr. at 211-18.) In fact, a DDS consultation request

21 questions whether further assessment should take place: "There are also UCD recs in file which

22 are old and note R knee pain and asthma. Do we need a current eval to r/o those impairments?

---

[9] In contrast, a chart note five years earlier, dated February 11, 2000, states "R. knee pain - cont. PRN Motrin. X-ray R. knee. F/U 2 wks. Explained to pt. knee has not been mentioned to myself since I have been following her since 8/25/99 & has not been mentioned in the chart since 5/97. We have no way tried to resolve this pain & it would be inappropriate to place patient on retirement disability [without] exhausting all methods of relieving pain & preserving function." (Tr. at 172.)

Pls rev." (Id. at 198.)  As a result, there is no functional assessment on file which assesses plaintiff's osteoarthritis of the knees.  It is true that the ALJ included the restriction of only occasionally performing postural activities; however, the term occasional is defined as no more than one third of a work day, and bending and stooping is required occasionally in the light work category.  SSR 83-14 at *4; 83-10 at *6.  Based on the plenitude of records concerning plaintiff's knee, it is unclear whether she could stoop to this extent.  Furthermore, the ALJ's assessment of light work requires standing or walking for a total of six hours in an eight hour day.  SSR 83-10 at *6.  Based on plaintiff's testimony and records, it is unclear whether her knees would hold her weight for six hours even if it is "off and on," as the ruling suggests.

Based on these records, the ALJ should have ordered a consultative exam.  On remand, the ALJ shall obtain one in order to assess the effect of plaintiff's obesity, asthma and osteoarthritis of the knees in combination with her already established impairments, to determine their effect on her residual functional capacity for the period at issue in this case.

### C. Third Party Testimony

Plaintiff's final assertion is that the ALJ did not even reference, let alone properly consider the lay opinion of Bea Jarrell, plaintiff's stepsister, who testified regarding plaintiff's functional limitations.

An ALJ is required to "consider observations by non-medical sources as to how an impairment affects a claimant's ability to work." Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987).  "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001) (citing Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)).  Similar to the ALJ's role in evaluating the testimony of a claimant, when evaluating the testimony of a lay witness "[t]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Sousa v. Callahan, 143 F.3d 1240, 1243 (9th Cir. 1998) (quoting

15

Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The Ninth Circuit has held that the ALJ must properly discuss lay witness testimony, and that any failure to do so is not harmless unless no reasonable ALJ, when fully crediting the testimony, could have come to a different disability determination. Stout v. Commissioner, 454 F.3d 1050 (9th Cir. 2006). This standard is extremely high and rivals, if not surpasses, the Chapman harmless error standard in criminal law (error harmless only if no reasonable doubt about its lack of effect).

Here, although the ALJ had discussed Jarrell's testimony in his March 2005 decision, that decision was vacated by the Appeals Council. (Id. at 69, 97.) In his latest decision, the ALJ made no mention of Ms. Jarrell's statements. Her testimony at the 2005 administrative hearing was that plaintiff's eyesight was so bad that if she had to transition from a well lit area to a darker area, she had to hold on to something to prevent herself from falling. (Tr. at 499-500.) She also testified that plaintiff's knees bothered her very badly if she had to make one or two trips down the stairs of her split level house. (Id. at 500.) In regard to plaintiff's tremors, her stepsister testified that they sometimes cause her to shake over her whole body, but conceded that she does not lose consciousness. (Id. at 501.)

The ALJ erred in declining to discuss Ms. Jarrell's testimony and such error was not harmless as a reasonable ALJ could have come to a different disability determination based on that testimony. As to defendant's argument that this witness did not testify to functional limitations beyond those assessed by the ALJ, the undersigned disagrees. Testimony that plaintiff has much pain in her knees after going up or down one or two flights of stairs in a split level house may contradict a finding that plaintiff can do light work which requires standing and/or walking for six hours in a day, and occasional postural activities which equates to up to one third of a day. See SSR 83-10 at *6, SSR 83-14 at *4.

The issue of substantial gainful activity cannot be determined until the ALJ has considered this testimony under the standards set forth above, and in contrast with the other

evidence. Once the ALJ makes a determination as to the weight given this lay testimony, he shall then re-evaluate the issue of substantial gainful activity in light of the standards set forth above.

CONCLUSION

For the reasons stated herein, IT IS ORDERED that: Plaintiff's Motion for Remand is granted in part pursuant to Sentence Four of 42 U.S.C. § 405(g), the Commissioner's Cross-Motion for Summary Judgment is denied, this matter is remanded for further findings in accordance with this order, and the Clerk is directed to enter Judgment for plaintiff.

DATED: 10/04/10

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Berry1741.ss.wpd